Parker C. J.
[After stating the facts.] The defendant acting for the parish, which was organized in 1824, defends against the plaintiff’s claim for his accustomed portion of the income, as established by the foregoing proceedings, by denying the validity of all those proceedings, and by asserting a right in the parish, as lawful successors to the original grantees of the land, or as a body for whose use it was granted as a ministerial lot, to the whole of the income arising therefrom, notwithstanding the agreement before stated, the legislative proceedings founded thereon, and the entire acquiescence of all the parties in any way interested in the fund for a period of nearly thirty years.
The first position taken in support of this defence is, that the grant being made to the original proprietors or grantees of the township for specific purposes stated therein, it was not within the constitutional power of the legislature to vary the terms of the grant or the uses and purposes for which it was made. And the position is correct with the limitation, that with the consent of the parties legally and equitably interested in the grant, a legislative act will avail to enable those parties to carry into effect just and honest intentions in relation to the property, preserving the original purpose and object of the grant. The donor was the legislature itself, the donees *164 or the cestui que trusts of the grant, were the proprietors and settlers in the township of Lanesborough, who afterwards became inhabitants of the town of Lanesborough, and the min isters of that town. An act relating to this property, founded on the consent of all these parties, and which does not change the use and application of the property, but distributes its income equally between two religious societies formed out of the inhabitants of the town, cannot we think be unconstitutional.
Had the original grant been appropriated to the support of a minister of the congregational order only, there might be more reason for complaint of these proceedings ; but the grant is of one lot for the use of the first settled minister, and of the lot in question for the use of the ministry only; so that the first settled minister of any denomination whatever would have acquired a title to the first lot, and the other would have belonged as ministerial land to the minister of any denomination who should have been regularly settled by the people of that township. An appropriation of the fund to the support of regularly settled ministers over any portion of the people, who should have constituted themselves a religious society distinct from the rest, with the consent of the principal body, under the sanction of the legislature, cannot be thought unjust or unwise, and is in no respect inconsistent with the original purposes of the grant.
It has not been unusual for the legislature to authorize towns, parishes, and other public bodies, to convert real into personal property for the benefit of such corporations ; and there certainly can be no objection to the exercise of this power, if thereby the will of the donors is not changed or perverted. And in the case before us, as the grant in 1741 was for the support of the ministry, for the benefit of the inhabitants of Lanesborough, it is no misapplication of the bounty to cause it to aid in the support of two regularly settled ministers instead of one.
In order to fortify this position taken by the defendant, it is argued, that immediately upon the organization of the episcopal society in Lanesborough, which was in 1767, the rest of the inhabitants became a separate and distinct parish *165 navmg rhe immunities and privileges of the first parish m that town, and that therefore the proceedings of the town, in 1796 and 1797, relative to the division of this property and the application for the sale of it, were void, because it was a subject of parochial interest, and the town as such had no control over it. But at that time the episcopal society existed only as a voluntary religious society. It was not incorporated, nor did it act in the assessment of taxes except through the municipal power. Neither did the congregational society assume a distinct legal character until within a few years; but all parochial concerns were conducted under the forms of municipal authority, according to the usages of our towns and parishes in early times. As a town it raised taxes for the support of its minister, and in the same capacity contracted with and settled a colleague pastor. Now admitting that by the mere organization of the episcopal church, without any act of incorporation, the residue of the inhabitants might have assumed the character of the first parish and organized themselves as such, yet they did not do it, but continued to transact all their parochial business under municipal authority until the episcopal church was in fact incorporated, which was not until 1823. Their doings in regard to the property in question were then as valid and effectual as any other transactions of a parochial nature which they undertook to perform. But a legal body politic is not created, or was not at that period, merely by a voluntary association of individuals ; it may perhaps exist by prescription, but at the period of these transactions no such title could be affirmed, for the society had not pretended to claim or exercise the rights of a body politic. The town, then, when it voted to apply to the legislature for authority to sell the land and to appropriate its proceeds in the manner stated, were exercising parochial rights over parochial property in the accustomed manner, and for purposes beneficial to those who were interested in the property.
The case of the First Parish in Brunswick v. Dunning, does not militate against this doctrine, for two poll parishes *166 had beee incorporated in that town, when the plaintiffs in the suit claimed to be considered as the first parish.
Then it is said the sale is void, because property thus appropriated cannot be parted with, even with the aid of legislative authority for that purpose ; and the case of The Inhabitants of Harrison v. The Inhabitants of Bridgeton is cited to maintain this point. But that case does not deny the validity of a sale under such authority ; it only decides that the property thus sold was riot, by the true construction of the act, to be divided between Harrison and Bridgeton, from which last town Harrison was created. The right of the town with its minister, upon license from the legislature, to sell, is not denied ; but it is held that no change in the use of the property could thus be made ; and although it is stated that the town could not dispose of the property, the evident intention of the Court is, that it cannot be treated like other town pro perty, but must be dealt with as parochial property, that is, that the minister and the town as a parish can alone transfer the fee.
It is true that the town or parish cannot dispose of land or other property thus held, otherwise than according to the provisions of the grant by which they hold ; but we consider the appropriation made in the grant conformed to in the subsequent disposition, because the grant was for the use of the ministry generally ; if it had been limited to the use of the congregational ministry, this objection would apply.
After thus considering all the objections which have been raised to this apparently most just and equitable disposition of a public fund, we are unable to perceive any ground to justify the present congregational society in taking possession of the whole fund and refusing to share the income according to an amicable adjustment made in the year 1796, and which has acquired all the force of a contract under the resolve of the legislature.
The first parish are lawful successors to the town in all the property of a parochial nature which remained the town’s when the parish came into existence, but before that time the town had agreed upon a division with part of the inhabitants, who *167 had as good a right to the property, in proportion to their number, as any other part, and this bargain has been sealed and sanctioned by the legislature.
The defendants must be defaulted and judgment be rendered for the sum agreed on.